ERVIN WALTER BLUM V. STATE.

No. 29,545. April 9, 1958.
Appellant's Motion for Rehearing Overruled
(Without Written Opinion by Majority of Court) October 22, 1958

542

*Percy Foreman,* Houston, for appellant.

*Dan Walton,* District Attorney, *Eugene Brady, C. C. Castles* and *Thomas D. White,* Assistants District Attorney, Houston, and *Leon Douglas,* State's Attorney, Austin, for the state.

MORRISON, Presiding Judge.

The offense is failure to stop and render aid, a felony; the punishment, five years.

The state offered five witnesses who were present when an automobile struck and injured Fannie Lucille Daggs, a colored cook and maid employed in a private home in River Oaks.

The injured party, who received a broken leg, testified that the car failed to stop at a stop sign, struck her and knocked her down and ran over her leg, then backed off and came again, a man's voice saying "I'm going to kill you, you s.o.b.;" that she grabbed the bumper and was dragged; that she turned loose when the car stopped and the driver backed again and drove away.

The injured party's daughter Jacquelyn, eleven years old at the time her mother was injured and twelve at the time of the trial, identified the automobile which struck her mother as that shown to belong to appellant, and positively identified appellant as the driver of the hit and run car.

Mary Jo Montague, nineteen-year old school girl who resided in River Oaks, saw the accident as she was stopped at the intersection. She gave chase in an attempt to obtain the license number of the automobile. She was shown a picture of appellant's car and asked if it was the hit and run car, and she said "I would say it was." She based her identification upon the fact that it was a Buick, green bottom and white top with venetian

blinds at the back and a "funny colored blue light over the license plate that kept the number from being plainly visible.

Mr. Zimmerman was an eye witness, the hit and run car having passed him at a rapid rate just before it struck the injured party. He heard the driver say "kill you," but did not understand anything else he said. He called to the driver to stop, saying "Stop you murderer." He described the hit and run car as a Buick, green with a lighter colored top, probably two or three years old; said it had lines like the car shown in the photographs of appellant's car and that the driver had the same "symetrical lines" as the defendant.

John Griffin testified as an eye witness and positively identified appellant as the driver and appellant's automobile as the hit and run car.

Jones, a photographer, testified that when he went to take photographs of appellant's car for appellant's insurance adjuster he heard appellant say "all this fuss over a Negro bitch" and heard the same voice say "I meant to kill the Negro bitch."

The hit and run incident was reported to police at 8:58 P.M. and was broadcast at 9:00 P.M. At 9:15 P.M., appellant called the police and reported that he had been hit in the head. When officers arrived at his apartment in answer to his call, he reported that he had been robbed of his car and his pocket book at West Gray and South Shepherd by two or three Negro men, one of whom hit him on the back of the head, and he woke up in front of his house. He described the car he had been robbed of as a 1952 Buick, black top, light gray bottom, air conditioned Roadmaster.

The officers found no abrasions or visible bumps, and appellant produced a pocket book from his pocket but put it back and said he did not have the license number of his stolen car. Later, about 10:45 P.M., other officers went to appellant's home and interrogated him, at which time he stated that one Negro held a knife against him and punched him in the back of the neck and that was all he remembered until he came to sitting on the curb in front of his home.

The officer took appellant with him on a cruise looking for the missing car. The 1952 Buick which appellant claimed, saying "there is my automobile," was found some three hundred yards

from appellant's home. The Buick so found was the Buick which was taken to the police station and was identified as the hit and run car. Appellant was also taken to the police station and to jail.

The arresting officer testified that the Buick which appellant claimed was either light green or light blue, with a lighter top —which the injured party's daughter picked out among other cars at the police station and identified as the hit and run car "without hesitation" the next morning.

Appellant did not testify and offered no testimony as to his whereabout or the whereabouts of his car at the time of the hit and run incident. His defense consisted of impeachment and attempted impeachment of the state's witnesses and vigorous cross-examination seeking to weaken or nullify their testimony tending to identify appellant and his car as the hit and run car and driver. Reversal is sought upon three points, all of which relate to attempted impeachment of state witnesses.

Bill of Exception No. 1-A complains that the written sworn statement made by Mary Jo Montague at the police station some hour and a half after the accident was not furnished counsel for the defendant to be used for impeachment of the witness, that counsel "was not permitted to cross-examine said witness Mary Jo Montague from said statement and the statement itself was not permitted to be read to the jury."

The statement in question was produced for the purpose of the bill of exception and reads:

"My name is Mary Jo Montague. I am 18 years of age. I live at 2125 Belmeade. I am a student.

"Tonight about 8:45 P.M., July 26, 1956, I was driving a 1952 Cadillac and was going north on River Oaks Boulevard. I came to the stop sign for San Felipe and stopped. I saw a car going west on San Felipe run the stop sign at River Oaks Boulevard.

"This car went across River Oaks Boulevard and hit a pedestrian that was crossing San Felipe. It did not stop at any time when it crossed River Oaks Boulevard. The woman that the car hit was crossing the street from north to south. She was crossing San Felipe Street.

"When the car hit her it stopped and then he started up again and was pushing her along in front of the car. He turned over toward his left curb and turned around. He pushed the woman up on the curb and then he backed up to get her off his car. He then pulled around her and turned right off of San Felipe onto River Oaks Boulevard, heading south. There were some people screaming to get the man's license number. Then a woman came and jumped in my car and said to get his license number but I couldn't see the number. I made a 'U' turn and started following him. He made a right turn off of River Oaks Boulevard onto Ella Lee. By the time I got there he was out of sight going around the circle. I got one more look at his license number. It was 2615 I think. The car was Green and white Buick about a 1950 to 1952. The top was white and the bottom was green. The car was going so fast that I couldn't see the driver very well.

"After I lost the car I returned to the scene of the accident. The woman that had been hit was still laying where the car had left her. I went over to a girl friend's house and then in about 10 minutes I came back and talked to the officers and told them what I knew. I was asked to come to the station and make this statement which I did."

Appellant points to the following testimony of Miss Montague to sustain his contention that there are significant omissions in the above statement which, at worst, support an inference of recent fabrication or, at least, an inference of over zealous coaching calculated to harm the rights of appellant. She testified that there were venetian blinds on the back of the hit and run car, that she heard a man's voice scream out "I am going to kill you," that there was a light over the license plate, and that she did not remember whether she saw any license number.

The predicate for impeaching the witness by the statement above quoted was: "Q. You told them everything you saw? A. Yes Sir, I did." The record shows that just prior to this testimony Miss Montague had testified that at the scene of the accident, and after she returned from her pursuit of the hit and run car, she talked to no one except the policeman and "I told the policeman what I had seen and he asked me to come down to the police station;" that she did so and remained at the station about four hours; "Q. In the meantime you were being questioned about what you saw? A. Yes, Sir. Q. You told them everything you saw? A. Yes, Sir, I did." It is apparent that the witness did not testify that the written statement contained all that she saw and heard.

The first witness who testified in the case was Officer D. L. Williams, who testified that he talked to Mary Jo Montague at the scene, but not at the police station; that she told him she chased the hit and run car about three blocks, that she thought the number was 2605 or 2615, he did not remember which, "she wasn't sure of the number." Officer Williams further testified that no one at the scene of the accident had given him any description of the hit and run driver. It is significant also that Officer Williams was required to deliver to defense counsel the information he received from witnesses at the scene and noted on four cards, without which he stated he would not be able to recall what each witness told him with reference to what they had seen or observed. The record shows that appellant's counsel offered these cards in evidence, but the same are not incorporated in the record before us.

Bill No. 2-A presents a similar complaint regarding a written statement of the eleven-year old Jacquelyn Daggs. By written as well as oral motion appellant's counsel sought to obtain order of the court requiring the delivery to him of the written statement of Jacquelyn to be used for the purpose of impeaching her. This bill shows that the statement in possession of the police was made at the police station the day following the accident; that such statement was produced and permitted to be examined by counsel for the defendant, but his request that he be permitted to cross-examine the witness from said statement and that it be admitted in evidence for the purpose of impeaching her was denied.

It was furnished for the purpose of the bill of exception and reads:

"My name is Jacquelyn Lois Daggs. I am eleven years of age. I reside at 2806 Canfield Street, Houston, Texas. I live with my mother and father. I am in the low sixth grade, and I attend Douglass school.

"Last night, July 26, 1956, sometimes after 8:00 P.M. my mother, brother and myself were coming from 3240 Delmonte street. We were walking West towards River Oaks Blvd. When we got to River Oaks Blvd. we crossed over to the West side of the street, and then started walking South on River Oaks Blvd. My mother and I were walking some distance ahead of my ten year old brother. When we got to where San Felipe crosses River Oaks Blvd. we stepped off the curb, and I saw a car coming West on San Felipe in the middle of the street, about a half a

block away from us. This car ran the stop sign at San Felipe and River Oaks Blvd., which was facing him. When I say this car run this stop sign, I stopped still in my tracks, but my mother walked on to the middle of the street. This car hit my mother with it's front end, and knocked my mother up the street aways, to the West. I then ran on across the street to the South West corner of the intersection, and ran to where my mother was laying. This car backed up off my mother and backed around into the street, heading back East on San Felipe. When this car headed back East he ran over my mother's left leg again. I saw that the car was going to run off.

"Some man hollered and told the driver to stop, but he just went on anyway. The car turned right to go South on River Oaks Blvd. This car left the scene of the accident, going real fast. I stayed with my mother until the Police and ambulance got there and I rode away to the hospital with my mother. Just before we left for the hospital I told one of the policemen that part of the license number of the car that struck my mother was NY. I can read and write and after reading the above statement I find it to be true and correct."

Jacquelyn Daggs, the testimony shows, was one of the witnesses that had made a statement to Officer Williams at the scene of the accident, memoranda of which was furnished appellant's counsel. While the statement is not before us, it is clear from the testimony of Officer Williams that Jacquelyn gave him no description of the hit and run driver and did not furnish him the letters of the license number of the hit and run car.

Appellant's counsel sought to interrogate Officer Williams about the contents of Jacquelyn's statement made the next day when he was not present, but not as to her statement to him at the scene of the accident or omissions therefrom except as indicated above. The written statement sought to be used for impeachment purposes was made long after appellant and his automobile had been taken into custody. Omission of detailed description of either the car or the driver in a statement made at that time would not assume the importance of like omissions from a statement made at the scene before the hit and run driver and his car had been found and identified. She identified the hit and run car, picking it out from a number of automobiles at the police station the same day.

Jacquelyn testified, in part, that she got a good look at the

driver; that he had on a red and white sport shirt, "I think it was," the design "checks, it looked like little dice-squares;" that the car was white and blue, top part white and the bottom blue, it was a Buick; that she saw the back glass and noticed blinds "like blinds you see in a house;" and that she first noticed the venetian blinds on the car "when he was going around the corner."

In appellant's motion and requests, it was stated that the statements of Jacquelyn and of Miss Montague would exculpate appellant and establish that it was not his automobile that struck Fannie Lucille Daggs, and were materially different from their sworn testimony. We find only omissions. Jacquelyn did not at any time testify that she told the officers everything she saw or heard but, on the contrary, testified that she answered only the questions asked, and answered every question truthfully. Her statements above quoted would not have shown to the contrary and would have refuted the claimed inconsistencies and conflicts.

In addition to the facts which we have heretofore outlined and on the question of possible injury to the appellant, we observe that the only serious omission in either of the statements is that in Jacquelyn Daggs' statement she did not describe the appellant, while in her testimony she identified him. Appellant was able to produce a letter written by the witness to her mother's attorney within a week after the accident. These are the circumstances of the letter. Jacquelyn testified that she went to the office of her mother's attorney after the accident and was told to write her version of everything she saw and mail it back to him. This she did, and in such letter, which was introduced in evidence, she does not endeavor to describe the driver of the automobile or his dress, nor does she give the make or color of the automobile, nor does she say that it had venetian blinds over the rear window. Since appellant was able to show to the jury that she made the same omissions in a written account prepared at her leisure in her own home after being instructed to write everything she could remember to her mother's lawyer, we would not feel called upon to reverse a conviction because of the exclusion of this cumulative evidence.

The statute now applicable in the Federal courts requires the production of such statements after the witness has testified on direct examination under the penalty of having the witness' testimony at the trial stricken from the record, or a mistrial ordered. 18 U.S.C.A., sec. 3500.

It should be noted that in the Federal courts, under the statute quoted, the refusal to make such statements available to the defense does not call for a reversal of the conviction but merely requires that the trial court strike from the record the testimony of the witness who had made the prior statement.

In view of what we have heretofore said, we do not feel called upon in this case to decide whether to extend the holding in Lopez v. State, 158 S.W. 2d 16, 252 S.W. 2d 701, and Dowling v. State, No. 29,637, 167 Texas Cr. Rep._____, 317 S.W. 2d 533,

so as to make it apply after the witness had testified, apply the Federal rule or hold, as appellant asks us to do, that reversible error is reflected by the action of the court in regard to such statements. We reserve a determination of that question until we are confronted with a case in which an accused has shown injury. Had the statements in question been tendered to the appellant and had he introduced them in evidence, they would have refuted his claim made on several occasions in the presence of the jury that such statements would have shown that the witnesses were fabricating and that his client was innocent. At most, they would show that the witnesses had failed to see that the statement which they signed contained everything which they knew about the transaction.

Appellant also asserts that the court erred in admitting in its entirety the deposition of Jacquelyn taken on May 10, 1957. Appellant himself introduced portions of the deposition, and the state offered the remainder. Lacy v. State, 137 Texas Cr. Rep. 362, 128 S.W. 2d 1165, does not support his contention, because in that case none of the testimony at the former hearing was introduced in evidence, as it was in the case at bar, and Article 728, V.A.C.C.P., did not come into operation.

Finding no reversible error, the judgment of the trial court is affirmed.

DAVIDSON, Judge, dissenting.

Appellant's motion for rehearing is overruled, without written opinion. I dissent.

A proper disposition of this case does not depend upon the question of the sufficiency of the predicate to impeach the state's witnesses Montague and Jacquelyn Daggs or the sufficiency of the testimony to impeach those witnesses.

The question here presented goes much deeper, for it directly involves the deprivation to this appellant of his right to be confronted by the witnesses against him, as guaranteed by the Constitution of this state, Art. 1, Sec. 10, which right carries with it the right of cross-examination of the witnesses.

There is no question but that the right of cross-examination is embodied in the constitutional right of confrontation. Ludwig v. State, 164 Texas Cr. Rep. 295, 298 S.W. 2d 166; Garcia v. State, 151 Texas Cr. Rep. 593, 210 S.W. 2d 574; Paulk v. State, 107 Texas Cr. Rep. 174, 296 S.W. 588.

The right of cross-examination is a condition essential to the reception of direct testimony. Testimony is not admissible if the person against whom it is to be used has no opportunity to cross-examine the witness. 44 Texas Jur., Witnesses, Sec. 145, at p. 1142.

In the light of those rules let us see if, as he claims, appellant has been deprived of his right to cross-examine the two state's witnesses named. In the first place, it is well to keep in mind that a felony case is tried by and before a jury. It is the jury that hears the testimony of the witnesses and passes upon their credibility. Obviously, therefore, when a witness testifies before the jury, the right to cross-examine that witness necessarily encompasses the requirement that the cross-examination be made in the presence and hearing of the jury. When the right to cross-examine the witness in the presence of the jury is cut off or denied, the constitutional right of cross-examination has been denied, as also has the right of trial by jury.

Such denial is exactly what this record shows.

The cross-examination of the witnesses Montague and Jacqueline Daggs as to certain phases of their testimony was before the trial court and not before the jury.

When appellant's counsel attempted to ask the predicate questions as to certain factors contained in written statements by the witnesses shortly after the alleged unlawful act, state's counsel interposed an objection. Thereupon, the jury was withdrawn, and the questioning as to the written statements of the witnesses was conducted entirely before the court and out of the presence of the jury. The written statements of the witnesses were introduced before the trial court but were never seen or

heard by the jury. At the completion of this cross-examination of the witnesses before the trial court, the state's objection was sustained and appellant was denied the right to go into the matter or to cross-examine the witnesses as to the matters developed upon the hearing before the court, including the right to introduce before the jury the written statements the witnesses had made.

Such action of the trial court of and within itself constituted a denial to the appellant of his constitutional right to cross-examine the witnesses against him. The denial to an accused of a right guaranteed by the Constitution is, of and within itself, prejudicial error.

To say that such error could be justified or held to be immaterial to the preservation to an accused of his rights goes to the very foundation of our judicial process, which is the right of trial by jury.

But this record does show that appellant, here, was both prejudiced and injured by the trial court's action.

To demonstrate such fact it is necessary only to call attention to the testimony of the witness Montague. It will be remembered that this was the witness who, in an endeavor to obtain the license number thereof, pursued the automobile that struck the injured party.

Upon the trial, the witness denied having obtained the license number. In the written statement she made shortly after the transaction, the witness stated the license number of the automobile she followed as "2615." The license number of appellant's automobile was entirely different from that number. In other words, if what the witness said in her statement was true, then it was not appellant's automobile that was involved in the alleged unlawful act, which would be a very material defensive fact.

It occurs to me that the least preservation to this appellant of the right of cross-examination would have accorded him the right to cross-examine the witness upon that point, alone.

Other portions of the statements of the witnesses could be adverted to, but if the matter already pointed out was not a vio-

lation of the right of cross-examination then neither would those matters be in violation thereof, and no good purpose would be served in discussing them.

In addition to the error shown, there is this further matter which precludes an affirmance of this case: I call attention to the fact that the indictment was drawn under and this case was prosecuted as a violation of Art. 1150, P.C., which makes it a felony for one to fail to stop and render aid after striking a person with an automobile. The charging part of the indictment alleged as follows:

"* * * Ervin Walter Blum on or about the 26th day of July, A.D. 1956, in said County and State was then and there the driver of, and person in control of, a motor vehicle, to wit, an automobile, upon a public highway in Harris County, Texas, and said motor vehicle which was then and there being operated by said Ervin Walter Blum, did then and there strike and collide with and cause injury to a person, to wit, Fannie Lucille Daggs, and the said Ervin Walter Blum did then and there unlawfully fail and refuse to stop after striking and colliding with the said Fannie Lucille Daggs, and did then and there drive on and leave said place where said collision occurred.

"* * * that Ervin Walter Blum, on or about the 26th day of July, A. D. 1956, in said County and State, was then and there the driver of, and person in control of a motor vehicle, to wit, an automobile, upon a public highway in Harris County, Texas, and said motor vehicle which was then and there being operated by said Ervin Walter Blum, did then and there strike and collide with and cause injury to a person, to wit, Fannie Lucille Daggs, and the said Ervin Walter Blum did then and there unlawfully fail and refuse to stop after striking and colliding with the said Fannie Lucille Daggs, and did then and there drive on and leave said place where said collision occurred, and did then and there fail to render all necessary assistance to the said Fannie Lucille Daggs, in this, to wit, he, the said Ervin Walter Blum, did then and there fail and neglect to carry the said Fannie Lucille Daggs to a physician for medical treatment, and did then and there fail to and neglect to procure a conveyance and assist in procuring a conveyance to carry the said Fannie Lucille Daggs to a place for treatment for her injuries received in said collision, said injuries to said Fannie Lucille Daggs then and there being of such a nature that such assistance was then and there required and necessary."

The indictment charged, correctly, a violation of Art. 1150, P.C.

In the case of Redding v. State, No. 29,759, delivered October 15, 1958, (page 517 this volume), 316 S.W. 2d 724; my brethren affirm a misdemeanor conviction for failure to stop after striking another vehicle with an automobile, which offense is denounced as a felony by Art. 1050, P.C.

In affirming that case my brethren hold that Art. 1150, P.C., including all that part thereof which made it a felony for one to fail to stop after striking another vehicle with an automobile, was repealed in 1947 by the passage of Sec. 39 of Art 6701d, R.C.S., which makes such acts a misdemeanor.*

To that conclusion I entered my dissent and, as reflected therein, I insisted that neither Art. 1150 P.C., nor any part thereof was repealed or affected by the passage of Art. 6701d, R.C.S., or any section thereof. I also insisted that if any part of Art. 1150, P.C., was repealed, as my brethren held, then that entire article had been repealed.

My brethren made no express determination that the whole of Art. 1150, P.C., was repealed by Art. 6701d, R.C.S. However, when they affirmed the county court conviction under an information in the Redding case they thereby held that Art. 1150, P.C., was no longer in existence and had been repealed, because the elements of that article were alleged and charged in the information in the Redding case.

Under those allegations the information charged a felony under Art. 1150, P.C., if that statute was in existence. I called attention to such fact in my dissenting opinion in the Redding case.

This prosecution was brought and the conviction was obtained as a violation of Art. 1150, P.C.

---

*"Sec. 39. (Accident involving damage to vehicle). The driver of any vehicle involved in an accident resulting only in damage to a vehicle which is driven or attended by any person shall immediately stop such vehicle at the scene of such accident or as close thereto as possible but shall forthwith return to and in every event shall remain at the scene of the accident until he has fulfilled the requirements of Section 40. Every such stop shall be made without obstructing traffic more than is necessary. Any person failing to stop or to comply with said requirements under such circumstances shall be guilty of a misdemeanor."

It is only by virtue of Art. 1150, P.C., that the indictment in this case can be sustained. There is no other statute which makes unlawful the acts alleged in the indictment here. Sec. 38 of Art. 6701d, R.C. S., can not be looked to as the statute supporting the indictment.**

Said Sec. 38 of Art. 6701d, R.C.S., makes it unlawful for the operator of any vehicle involved in an accident wherein some person is injured to fail to stop at the scene of such accident.

To charge a violation of that section, the indictment must of necessity allege that some person was either injured or killed as the result of an accident in which the driver of a vehicle was involved.

The instant indictment contains no such allegation. It does not charge, therefore, a violation of Sec. 38 of Art. 6701d, R.C.S. —all of which demonstrates the correctness of my position in the Redding case, that being that Art. 1150, P.C., is now in full force and effect and has never been repealed, modified, or changed by any act of the legislature.

When my brethren hold as they did, in affirming the Redding case, then Art. 1150, P.C., was, in 1947, completely destroyed by the enactment of Art. 6701d, R.C.S., Art. 1150, P.C., could not, then, furnish the statute under which this prosecution was brought and conviction obtained.

This conviction, then, must be sustained—if at all—under Sec. 38, of Art. 6701d, R.C.S. As pointed out, the indictment wholly fails to allege the constituent elements of that statute.

If the holding in the Redding case is correct, then this conviction can not be sustained under Art. 1150, P.C., because that statute ceased to exist in 1947. If Sec. 38 of Art. 6701d, R.C.S. superseded Art. 1150, P.C., then in order to affirm this convic-

---

**"Sec. 38. (Accidents involving death or personal injuries) (a) The driver of any vehicle involved in an accident resulting in injury to or death of any person shall immediately stop such vehicle at the scene of such accident or as close thereto as possible but shall then forthwith return to and in every event shall remain at the scene of the accident until he has fulfilled the requirements of Section 40. Every such stop shall be made without obstructing traffic more than is necessary.

"(b) Any person failing to stop or to comply with said requirements under such circumstances shall upon conviction be punished by imprisonment in the penitentiary not to exceed five (5) years or in jail not exceeding one (1) year or by fine not exceeding Five Thousand ($5,000.00) Dollars, or by both such fine and imprisonment."

tion under that section (Sec. 38 of Art. 6701d, R.C.S.) the indictment must allege a violation of that section.

The indictment, here, alleges a violation of Art. 1150, P.C.

Has Art. 1150, P.C., been repealed? Under the holding in the Redding case, it has been. Under the holding here, it has not been repealed.

The inconsistency in the holdings in the two cases, Redding and the instant case, is apparent.

#### ON APPELLANT'S SECOND MOTION FOR REHEARING

MORRISON, Presiding Judge.

It has been suggested that the jury were not permitted to hear the witness Montague on the question of the license number or any impeachment thereof. We call attention to the following portions of her direct examination in the hearing of the jury:

"Q. Did you ever get the license number of that Buick? A. No sir. I got a number that I thought was the number.

"Q. And did you turn over what you thought was the number to the police officers? A. Yes sir.

"Q. And did they put it on the air? A. I don't know.

"Q. Are you sure of any numbers that you tried to get from that Buick—Are you sure that any of the numbers that you got were accurate or correct? A. No sir.

"Q. Did you ever tell anybody that the numbers you got off the Buick, that you were certain were accurate or correct? A. No sir.

"Q. Are you certain right now what any number of that Buick license plate was? A. No sir."

On cross-examination by appellant's counsel, also in the hearing of the jury, we find the following:

"Q. You had already seen the numbers for a distance of at least three blocks before you got to Ella Lee, had you not, Miss

Montague? A.   I don't remember whether I saw any license number.

"Q.   Did you make up the number you gave the officer as the number? A.   No sir.

"Q.   Where then, Miss Montague, did you get the number, 2615, if that was the number you gave the officer? A.   It must have been the number that I thought I saw.

"Q.   You mean at this time you have no recollection of having seen the license number, but that night you assumed you had seen it, and did give him the correct number, is that what you mean? A.   No sir. That night I wasn't sure those were the right numbers.

"Q.   Where did you get the number, such as you did give the officer, if not from the license plate? A.   They were numbers that I thought I had seen.

"Q.   On the license plate? A.   Yes sir."

We remain convinced of the soundness of our original opinion, and appellant's second motion for rehearing is overruled.